UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Christopher Orloski,

      Plaintiff,

v.

Terrorist Screening Center,
National Counterterrorism Center,
Federal Bureau of Investigation,
Office of the Director of National Intelligence,
Florida Department of Law Enforcement,

      Defendants.

Case Number: 8:18-cv-709-T-33MAP

---

## Complaint

---

1

# Table of Contents

1 Acronyms Used ............................................................................................ 4

2 Introduction ................................................................................................. 5

3 Related Case ............................................................................................. 11

4 Parties ...................................................................................................... 11

   4.1 Plaintiff: Christopher Orloski ................................................................. 11

   4.2 Defendants ........................................................................................ 12

      4.2.1 Defendant: Terrorist Screening Center (TSC) ................................ 12

      4.2.2 Defendant: National Counterterrorism Center (NCTC) ..................... 13

      4.2.3 Defendant: Federal Bureau of Investigation (FBI) ........................... 14

      4.2.4 Defendant: Office of the Director of National Intelligence (ODNI) ........... 14

      4.2.5 Defendant: Florida Department of Law Enforcement (FDLE) ............... 14

      4.2.6 Defendant: Individual U.S. Employees and Agents ......................... 15

      4.2.7 Defendant: Other Defendants .................................................... 16

5 Jurisdiction and Venue ............................................................................... 16

   5.1 Jurisdiction ........................................................................................ 16

   5.2 Venue ............................................................................................... 16

6 Tolling of 28 U.S.C. § 2401(b) (Time for Commencing Action against United States) 17

7 State of Florida Statute of Limitations ........................................................... 18

8 Assertions ................................................................................................ 18

   8.1 Mr. Orloski Is a Pacifist and Law-Abiding Citizen ...................................... 18

   8.2 Mutual Exclusivity of Mental Illness and Terrorism .................................... 19

   8.3 With Great Power Comes Great Responsibility .......................................... 22

   8.4 Deceit by Defendants .......................................................................... 22

   8.5 Consequences of Deceit by Defendants .................................................. 23

   8.6 Defendants May Be the Terrorists in This Case ........................................ 24

   8.7 Better Use of Taxpayer Funds .............................................................. 24

9 Facts ....................................................................................................... 24

   9.1 Introduction ....................................................................................... 24

   9.2 Exhaustion of Administrative Remedies ................................................... 26

   9.3 Characteristics of Defendants ............................................................... 26

   9.4 An Overview of How the Terrorist Screening Database Works ...................... 27

   9.5 Mr. Orloski Is Still an American (for Now at Least) .................................... 30

9.6     A 2015 Encounter with CBP and HSI Indicating FDLE as a Tortfeasor ........... 31

9.7     TSA's Extended Screening Is Battery through Proxy ........................................ 32

9.8     A Redress Control Number ............................................................................. 32

9.9     Mr. Orloski's Disability .................................................................................... 32

9.10    Mr. Orloski's Psychotic Episode from July 2013 to December 2015 ............. 33

9.11    A Suspected Terrorist in Tampa and Boston in 2015 ..................................... 33

9.12    A Suspected Terrorist in Iceland in 2015 ...................................................... 34

9.13    Mr. Orloski Challenges DHS with His Political Asylum in Iceland in 2015 ..... 34

9.14    A Suspected Terrorist in Florida and Colorado in 2017 ................................. 38

9.15    A Suspected Terrorist in Florida and Colorado in 2018 ................................. 39

9.16    It Is Outrageous That Mr. Orloski's Cat, Copernicus Storm, Is Also a Terrorist in TSDB and TIDE ..................................................................................................... 39

9.17    Mr. Orloski's Injuries ..................................................................................... 43

    9.17.1    Deprivation of Liberty in the United Kingdom in 2014 ............................ 43

    9.17.2    Exacerbation of Mr. Orloski's Mental Disability ...................................... 44

10      Claims for Relief ................................................................................................ 46

10.1    Count 1: Claim of Negligence in Violation of Florida Tort Law ...................... 46

10.2    Count 2: Claim of Intentional Infliction of Emotional Distress in Violation of Florida Tort Law .......................................................................................................... 46

10.3    Count 3: Claim of Battery through Proxy in Violation of Florida Tort Law ..... 46

10.4    Count 4: Claim of Intentional Misconduct in Violation of Florida Tort Law .... 46

10.5    Count 5: Claim of Gross Negligence in Violation of Florida Tort Law ............ 47

10.6    Count 6: Violations of the Air Carrier Access Act of 1986 (ACAA) through Proxy   47

10.7    Count 7: Violations of 18 U.S.C. § 1001 by Defendants ................................ 48

10.8    Count 8: Violations of 18 U.S.C. § 1038 by Defendants ................................ 48

10.9    Count 9: Violations of the First Amendment to the U.S. Constitution ............ 49

11      Predictions on Survivability of Plaintiff's Claims .................................................. 54

12      Prayer for Relief ................................................................................................. 55

13      Trial by Jury Is Not Requested ............................................................................ 57



An Agent
of Social
Change

# 1  Acronyms Used

1. CBP - Customs and Border Protection
2. CRS - Congressional Research Service
3. DHS - Department of Homeland Security
4. DOJ - Department of Justice
5. FBI - Federal Bureau of Investigation
6. FDLE - Florida Department of Law Enforcement
7. FTCA - Federal Tort Claims Act
8. HSI - Homeland Security Investigations
9. IC - (U.S.) Intelligence Community
10. IIED - Intentional Infliction of Emotional Distress
11. KST - Known or Suspected Terrorist
12. NCTC - National Counterterrorism Center
13. ODNI - Office of the Director of National Intelligence
14. OGC - Office of the General Counsel
15. OIG - Office of the Inspector General
16. OPA - Office of Public Affairs
17. OSI - Open Source Intelligence
18. TIDE - Terrorist Identities Datamart Environment
19. TRIP - (DHS) Traveler Redress Inquiry Program
20. TSA - Transportation Security Administration
21. TSC - Terrorist Screening Center
22. TSDB - Terrorist Screening Database

## 2  Introduction

23.     Plaintiff is suing Defendants for their erroneous classification of Plaintiff as a terrorist and for Plaintiff's injuries caused by Defendants' negligence, gross negligence, intentional misconduct, IIED, battery through proxy, violations of federal law and violations of the First Amendment to the U.S. Constitution (freedom of speech).

24.     Defendants negligently and/or intentionally transmitted, collected, compiled and/or omitted intelligence about Plaintiff in their computer systems. Defendants claimed beginning in 2014 that Plaintiff was a terrorist and has shared that status internationally since 2014. Plaintiff asserts that he was not and is not a terrorist, but rather a mentally disabled individual who has received Social Security disability benefits since 2007. Plaintiff alleges that Defendants' negligent, deceitful and/or intentional omission of intelligence led to his classification as a terrorist.

25.     Plaintiff alleges that Defendants intended to punish and harm Plaintiff for his mental disability, thereby discriminating on the basis of disability. Plaintiff alleges that Defendants are violating Plaintiff's civil liberties and First Amendment freedom of speech rights by discriminating against him on the basis of disability.

26.     Defendants engage in bullying behaviors for several reasons: 1) because they enjoy bullying and schadenfreude, 2) because of limited oversight of or absence of oversight of their operations, 3) because of lack of transparency and supervision while operating under a cloak of darkness and secrecy, 4) because of lack of corrective intervention, judicial or otherwise, and 5) because bullying promotes Defendants'

businesses and business models in which they create the very thing, which they are mandated to prevent—terrorism and crime.[1] Bullying is good business.

27.    With the aid of the Court, Plaintiff will discretely, professionally and surgically make Defendants' gathered intelligence about himself **transparent** for purposes of proving Defendants' misconduct. **Transparency** is owed to Plaintiff by Defendants since Defendants have chosen either to be negligent, to engage in intentional misconduct or both in their erroneous classification of a mentally disabled individual as a terrorist. Plaintiff requires **transparency** to understand how a law-abiding citizen's identity can become resident in Defendants' terrorist watchlist databases. By proceeding in this civil action and by demanding **transparency** of Defendants, Plaintiff asserts that he performs a public good as he confronts a national security apparatus apparently gone wrong.[2] Plaintiff's father concurs with Plaintiff on this. Plaintiff's mother is Stoic, which is understandable when she hears unbearably offensive acronyms like CIA, NSA and DIA. Plaintiff's sister, through her wall of silence, doesn't give a **flying rat expletive** whether Plaintiff performs a public good or not.

28.    Plaintiff through this civil action challenges Defendants' apparent exercise of a **federal 'license' to deceive** wantonly and without consequence.

29.    As the Court will come to learn by reading this complaint and its exhibits, this case is very little about terrorism and much more about mental health, the

---

[1] For details on how and why Defendants create terrorism and crime, see Chapter 1 (Understanding the Conflict between the Police and the Public in the United States) at pages 13-20 and Chapter 33 (Their Creation of Monsters Gives Them Monsters to Fight) at pages 101-102 in Exhibit 07, *Federal Terrorists*, a book authored by Plaintiff in 2016.
[2] "An informed public is the most potent of all restraints upon misgovernment." *Grosjean v. American Press Co., Inc.*, 297 U.S. 233 (1936).

Defendants' exploitation of an individual's mental unwellness for business and profit, the failure of psychiatry[3] to provide a cure and the presence or absence of First Amendment rights (of freedom of speech and art) during a disabled individual's mental unwellness.

30.     Plaintiff challenges any of Defendants' state secrets privileges in light of Defendants' deceitful and/or negligent behaviors and in light of the lack of reasonable danger that disclosure of intelligence/assessments about Plaintiff would harm national security. See *United States v. Reynolds*, 345 U.S. 1 (1953). See <u>Exhibit 10</u> (*The State Secrets Privilege: Preventing the Disclosure of Sensitive National Security Information During Civil Litigation*, Congressional Research Service, August 16, 2011) at page 2 (regarding *Reynolds*), and at pages 21-22 (regarding Defendants' FBI's/TSC's Terrorist Screening Database). See also *Rahman v. Chertoff*, case no. 05 C 3761, 2008 U.S. Dist. LEXIS 32356 (N.D. Ill. 2008) (judge's opinion in Dkt. 370 attached as <u>Exhibit 11</u> to this complaint).

31.     Plaintiff in this civil action confronts the ultimate bullies who engage in malfeasance yet answer to no one and who are unreachably hidden from public contact by layers of federal law and judicial protection in the name of national security.

32.     This is an *American David vs. U.S. Goliath* scenario, in which Plaintiff, whose 2018 annual disability income is $16,692, goes up against the draconian national security apparatus of the U.S. Government having an annual budget of $3.65 trillion[4] in 2018. Plaintiff's financial disadvantage is obvious; Plaintiff's income is 4.57 billionths

---

[3] In <u>Exhibit 05</u> at page 70, Plaintiff performs a background check on psychiatry and finds that psychiatry's historical methods of torture and abuse in the 1700s were equal to or worse than those of the Islamic State in 2016. Thus, it becomes easier to understand today's non-curative nature of psychiatry based on its 300-year background as torturers and abusers.
[4] 2018 estimate. Source: https://www.gpo.gov/fdsys/search/pagedetails.action?granuleId=BUDGET-2018-TAB-8&packageId=BUDGET-2018-TAB

that of the U.S. Government. And that's what makes Defendants the <u>ultimate</u> bullies— their gargantuan fiscal muscle combined with their shadowy *modus operandi.*

33.    This civil action seeks injunctive and declaratory relief and compensatory and punitive damages against Defendants for their:

1) Negligence in violation of Florida tort law, § 768.041 *et al.*, Florida Statutes;

2) Intentional Infliction of Emotional Distress (IIED) in violation of Florida tort law;

3) Battery through proxy in violation of Florida tort law;

4) Intentional misconduct in violation of Florida tort law, § 768.72(2)(a), Florida Statutes;

5) Gross negligence in violation of Florida tort law, § 768.72(2)(b), Florida Statutes;

6) Violations through proxy (of TSA and airline companies) of the Air Carrier Access Act of 1986 (ACAA);

7) Violations of 18 U.S.C. § 1001 (False and fraudulent statements or entries to the U.S. Government generally)[5];

8) Violations of 18 U.S.C. § 1038 (False information and hoaxes)[5];

9) Violations of the First Amendment to the U.S. Constitution, specifically the squelching of freedom of speech and trampling of art

34.    Plaintiff has been erroneously and/or intentionally and/or deceitfully nominated and validated by Defendants as a Known or Suspected Terrorist (KST) in Defendant Terrorist Screening Center's terrorist watchlist known as the Terrorist Screening Database (TSDB) and in Defendant National Counterterrorism Center's terrorist watchlist known as the Terrorist Identities Datamart Environment (TIDE)

---

[5] Obviously, Plaintiff is not a federal prosecutor and criminal matters are not within the scope of this civil action; therefore, Plaintiff merely introduces the possibility of crimes committed by Defendants and relies on the U.S. Attorney to pursue any alleged criminal conduct by Defendants.

database. Plaintiff made this determination through deduction and inference based on his deprivation of liberty, difficulties with freedom of movement and difficulties with air travel both domestically and internationally, specifically airline boarding pass policies and TSA's extended screening procedures at airport security checkpoints and terminal gates.

35.    Gathering of proof that Plaintiff's identity resides in the TSDB and TIDE databases requires Plaintiff to issue to Defendants requests for admission, interrogatories, requests for production and depositions through oral examination. Plaintiff's identity may be present in other terrorist watchlists of which he has no knowledge at the time of filing of this action; Plaintiff would require use of the discovery process to learn of any other databases and watchlists in which his identity resides.

36.    The effects of placement of Plaintiff on U.S. terrorist watchlists are far-reaching; Plaintiff's classification as a KST has impacted his freedom of movement and liberty in other nations (United Kingdom) and has affected his international and domestic air travel beginning in 2014.

37.    Plaintiff alleges that his placement in the TSDB and TIDE databases as a KST is due to provision of false information and/or omissions of intelligence by one or more law enforcement agencies located in the United States, namely Defendant Florida Department of Law Enforcement (FDLE). Because FDLE lied to U.S. Government agencies, FDLE is in violation of 18 U.S.C. § 1001.

38.    Plaintiff alleges that Defendants are intent on retaliation and on violating Plaintiff's civil liberties for his petitioning of the government for a redress of grievances (*Orloski v. U.S. Department of Homeland Security, et al.*, case no. 8:15-cv-570-SDM-

9

MAP, U.S. District Court for the Middle District of Florida). Defendants' retaliation is in the form of non-response and resolute maintenance of Plaintiff's status as a KST.

39.    Further, Plaintiff alleges that Defendants believe that erroneous inclusion of U.S. citizens in their terrorist watchlists is of no consequence. Because Defendants suffer no repercussions for their erroneous and/or deceitful information practices, ordinary and vulnerable U.S. citizens are routinely inducted into Defendants' TSDB and TIDE databases. Defendants fail to respond to claims and attempts at administrative remedy. Therefore, U.S. citizens, including Plaintiff, have no recourse or remedy except through judicial action.

40.    Ultimately Plaintiff seeks reversal of his classification as a Known or Suspected Terrorist in the TSDB and TIDE databases and any other databases that function as a terrorist watchlist.

41.    Plaintiff's intent by providing a lengthy complaint of 58 pages is to give sufficient detail to demonstrate to the Court that the action is likely to succeed on the merits and that Plaintiff has standing. Plaintiff has a complicated story to tell, including the failure of psychiatry to provide a cure, which leads to psychotic works of art, and he would rather err on the side of copious detail and holism than on the side of sparse facts and incompleteness. The complaint is lengthy also because of Plaintiff's efforts to illustrate the causality of events and why things happened the way they did. Plaintiff provides a compendium of facts because he feels compelled to convince the Court that he is not a terrorist. Plaintiff *is* making an attempt to tell his story as succinctly as possible. If the Court so desires, Plaintiff will amend his complaint to better comply with Fed. R. Civ. P. 8(a).

## 3  Related Case

42.     This civil action and complaint are a refiling of a related case, *Orloski v. Terrorist Screening Center, et al.*, case no. 8:17-cv-1815-VMC-AAS in the U.S. District Court for the Middle District of Florida Tampa Division. The Judge in the above case dismissed the case without prejudice and granted refiling of the action pending exhaustion of administrative remedies as required by the Federal Tort Claims Act. For the court's order see Dkt. 14 in case 8:17-cv-1815.

43.     In August 2017, Defendants received copies of Plaintiff's complaint in case 8:17-cv-1815. Receipt of complaints by Defendants had no effect on Plaintiff's status as a KST in Defendants' databases. Plaintiff's January 2018 air travel indicated (through TSA's extended screening and Southwest Airline's actions) that Plaintiff's status was unchanged. Plaintiff absolutely believes that judicial action and a court order will be required to correct Plaintiff's status in TSDB and TIDE and to correct Defendants' use of deceit against ordinary and vulnerable citizens such as Plaintiff.

## 4  Parties

### 4.1  Plaintiff: Christopher Orloski

44.     Plaintiff, Christopher Orloski, is a resident of Clearwater, Pinellas County, Florida. Mr. Orloski is a U.S. citizen. Mr. Orloski is a person with a disability within the meaning of the Social Security Administration's rules for determining disability (he has been disabled under SSA's rules since December 2, 2006), within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12102(1)(A,B,C), within the meaning of the Rehabilitation Act, 29 U.S.C. §§ 705(9)(A,B); 705(20)(A); 705(21)(A), within the

meaning of the Fair Housing Act, 42 U.S.C. § 3602(h)(1,2), within the meaning of the Air Carrier Access Act, 49 U.S.C. § 41705, and in general any federal statute that defines disability.

45.    With regard to Defendants, Mr. Orloski is classified by Defendants erroneously as a Known or Suspected Terrorist (KST) and has been placed on Defendants' terrorist watchlists, which impede Mr. Orloski's liberty and air travel both domestically within the U.S. and internationally.

46.    Plaintiff proceeds in this action *pro se* because he cannot afford competent counsel and because he was denied legal aid by *pro bono* agencies in the Tampa Bay area in 2016 and 2017. See Exhibit 04 for the legal aid circular-referral-circus, which leaves those needing legal aid without legal services. Further, Plaintiff has no **federal legal advocate** through the yet-to-exist U.S. Department of Social Services' Legal Aid Bureau.

## 4.2  Defendants

### 4.2.1  Defendant: Terrorist Screening Center (TSC)

> The TSC is a multi-agency center administered by the Federal Bureau of Investigation and is the U.S. Government's consolidated counterterrorism watchlisting component responsible for the management and operation of the Terrorist Screening Database [TSDB], commonly known as "the watchlist."[6]

47.    The TSC's publicly viewable web page as of February 6, 2018 is

https://www.fbi.gov/about/leadership-and-structure/national-security-branch/tsc.

---

[6] Source: TSC's FAQ page 1 (https://www.fbi.gov/file-repository/terrorist-screening-center-frequently-asked-questions.pdf)

48. As the TSC is clandestine and inaccessible to the public, their address, phone numbers and email contact addresses are not published and not known to Plaintiff. But since TSC is bullying the public, and specifically bullying Plaintiff, it becomes obvious that a public interface is needed through which the public can contest bullying and erroneous classification; therefore, Plaintiff will seek discovery in this action to produce a TSC public interface including phone numbers, email addresses, mailing addresses and an effective grievance procedure.

### 4.2.2   Defendant: National Counterterrorism Center (NCTC)

49. The NCTC is authorized under 50 U.S.C. § 3056 and Presidential Executive Order (EO) 13354, which became the foundation for codifying NCTC's authorities in the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA).

> The National Counterterrorism Center is a United States government organization responsible for national and international counterterrorism efforts. It is based in a modern complex in McLean, Virginia, called Liberty Crossing near Tysons Corner. NCTC advises the United States on terrorism. Part of the Office of the Director of National Intelligence, the group brings together specialists from other federal agencies, including the CIA, the FBI, and the Department of Defense. In 2012, the United States Attorney General Eric Holder granted the agency the authority to collect, store, and analyze extensive data collections on U.S. citizens compiled from governmental and non-governmental sources for suspicious behavior through pattern analysis and **to share the databases with foreign states**. The effort has drawn controversy for its pre-crime effort, which has been likened to the Information Awareness Office and its proposed mass surveillance. [The NCTC] is in charge of the Terrorist Identities Datamart Environment (TIDE) database.[7]

---

[7] Source: wikipedia.org, https://en.wikipedia.org/wiki/National_Counterterrorism_Center

50.     The NCTC's web site is: https://www.dni.gov/index.php/nctc-home.

51.     The NCTC permits public contact of its Office of Public Affairs (OPA). The NCTC OPA email contact address is: nctcpao@nctc.gov. The NCTC OPA is 100% non-responsive to Plaintiff's emails—nctcpao@nctc.gov is a black hole.

52.     The NCTC's mailing address is: National Counterterrorism Center, Washington, DC 20511.

### 4.2.3   Defendant: Federal Bureau of Investigation (FBI)

53.     The FBI oversees the TSC and is ultimately responsible for its operations.

54.     The FBI's web site is: https://www.fbi.gov.

55.     The FBI's address is: FBI Headquarters, 935 Pennsylvania Avenue, NW Washington, D.C. 20535-0001

56.     The FBI's main phone line is: (202) 324-3000.

### 4.2.4   Defendant: Office of the Director of National Intelligence (ODNI)

57.     The ODNI's mission is to:

- Lead Intelligence Integration
- Forge an Intelligence Community that delivers the most insightful intelligence possible[8]

58.     The ODNI umbrellas the NCTC and its TIDE database.

59.     The ODNI's address is: Office of the Director of National Intelligence, Washington, DC 20511.

### 4.2.5   Defendant: Florida Department of Law Enforcement (FDLE)

60.     The FDLE is a State of Florida law enforcement agency.

---

[8] Source: ODNI, https://www.dni.gov/index.php/who-we-are/mission-vision

61.　The FDLE is headquartered in Tallahassee, Florida and has approximately 2,000 employees statewide. The department maintains 7 regional operations centers, 12 field offices and 7 crime laboratories.

62.　The FDLE is the State of Florida's investigative arm.

63.　The FDLE's mission, according to their web site is:

```
To promote public safety and strengthen domestic
security by providing services in partnership with
local, state, and federal criminal justice agencies to
prevent, investigate, and solve crimes while
protecting Florida's citizens and visitors.[9]
```

64.　The FDLE's four fundamental values, according to FDLE, are service, integrity, respect, and quality. These values are in dispute in this civil action.

65.　The FDLE is a first responder, but for purposes of this civil action is considered part of the U.S. Intelligence Community, as the line between crime and terrorism is blurred by the U.S. Government for purposes of intelligence sharing.

66.　The FDLE's mailing address is: Florida Department of Law Enforcement, P.O. Box 1489, Tallahassee, FL 32302-1489.

67.　The FDLE's physical address is: Florida Department of Law Enforcement, 2331 Phillips Road, Tallahassee, FL 32308.

68.　The FDLE's main telephone line is: (850) 410-7000.

69.　The FDLE's records custodian is reachable via: publicrecords@fdle.state.fl.us.

70.　The FDLE's web site is: http://www.fdle.state.fl.us.

### 4.2.6　Defendant: Individual U.S. Employees and Agents

---

[9] Source: http://www.fdle.state.fl.us/cms/home.aspx

71.     Because of the secretive, shadowy nature of the U.S. Intelligence Community, Plaintiff cannot know, prior to discovery, the names of individual U.S. employees and agents responsible for torts and for violations of federal laws described herein.

72.     Plaintiff reserves the right to inform the Court of individuals responsible for torts as such individuals become known to Plaintiff during the discovery phase of this civil action.

### 4.2.7   Defendant: Other Defendants

73.     Plaintiff reserves the right to amend his complaint to add defendants (other state, federal or foreign agencies and individuals) as they become known during the discovery phase of this civil action.

## 5   Jurisdiction and Venue

### 5.1   Jurisdiction

74.     The question before the Court is a federal question, 28 U.S.C. § 1331.

75.     Further, this action is brought pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, against agencies of the United States of America; The FTCA vests exclusive subject matter jurisdiction of federal tort claims litigation in the U.S. District Court.

76.     Further, several claims herein arise from alleged violations of civil and criminal laws of the United States and violations of the U.S. Constitution's Bill of Rights.

### 5.2   Venue

77.     The Court is the proper venue for this civil action as the alleged violations of federal laws were committed by the Defendants while Plaintiff was in the United States (Florida, Colorado, Massachusetts and New York) and internationally (Iceland and the United Kingdom).

# 6   Tolling of 28 U.S.C. § 2401(b) (Time for Commencing Action against United States)

78.     28 U.S.C. § 2401(b) governs the statute of limitations for filing a tort claim against the United States. An administrative claim must be filed within two years of the alleged tort.

```
28 U.S.C. § 2401(b): A tort claim against the United
States shall be forever barred unless it is presented
in writing to the appropriate Federal agency within
two years after such claim accrues or unless action is
begun within six months after the date of mailing, by
certified or registered mail, of notice of final
denial of the claim by the agency to which it was
presented.
```

79.     Plaintiff's causes of action are ongoing. Plaintiff's classification as a KST in TIDE and TSDB persists, and Plaintiff continues to suffer injuries resulting from extended screening by TSA and from altered airline policies at domestic U.S. and international airports.

80.     Plaintiff's initial extended screenings by TSA and initial special handling by domestic and international airlines occurred in 2015 in Tampa, Boston, New York, and Keflavík, Iceland.

81.     Plaintiff's second-most recent extended screenings by TSA were at Tampa International Airport on July 19, 2017 and Denver International Airport on July

26, 2017; therefore, Plaintiff's administrative claims (U.S. DOJ forms SF-95) to Defendants FBI/TSC and ODNI/NCTC were timely filed. The FBI received Plaintiff's administrative claim on September 25, 2017. The ODNI is predicted to have received Plaintiff's administrative claim also on September 25, 2017[10]. See Exhibit 02 for Plaintiff's administrative claims.

## 7   State of Florida Statute of Limitations

82.      The statute of limitations for negligence and intentional torts are governed by §§ 95.11(3)(a) and 95.11(3)(o), Florida Statutes. A plaintiff must file an action founded on negligence or intentional tort within four years of when the cause of action accrues. A cause of action accrues when the last element constituting the cause of action occurs. See § 95.031(1), Florida Statues. Because Defendants entry of Plaintiff into the TSDB and TIDE databases occurred in 2014, because Plaintiff's status as a KST is persistent and because injuries through proxy by airlines and by TSA are ongoing, Plaintiff's action is timely filed.

## 8   Assertions

### 8.1   Mr. Orloski Is a Pacifist and Law-Abiding Citizen

---

[10] Because of an apparent relationship between the U.S. Postal Service and the ODNI, mail addressed to the ODNI never receives a "delivered" status, which the U.S. Postal Service would normally report via its web site, usps.com. Plaintiff's properly signed, submitted and addressed SF-95 form and envelope were mailed to the ODNI on September 18, 2017. It is assumed that the package arrived by September 25, 2017 in the ODNI's Office of the General Counsel.

83.     Mr. Orloski is a pacifist and law-abiding citizen, with exception to the unavoidable influence and behavioral side-effects of psychiatry and psychopharmaceuticals, which began in 1997.[11]

84.     Defendants have painted a picture of Mr. Orloski that is not true, and that erroneous picture is likely being shared with foreign governments. Mr. Orloski asserts that he is not a terrorist. Mr. Orloski, before his exposure to psychiatry in 1997, was absolutely law-abiding. After exposure to psychiatric medications in 1997 at age 29, Mr. Orloski did experience behavioral side-effects that resulted in homelessness, nuisance offenses and contact with law enforcement. But, neither the effects and consequences of exposure to psychiatry nor Mr. Orloski's mental illness itself can be the reason for Defendants' labeling of Mr. Orloski as a terrorist.

85.     For an accurate picture of Mr. Orloski that Mr. Orloski has painted himself, showing his talents of composing music, making sushi, loving his cat, photography and authoring books and social analyses, please visit http://christopherorloski.com or see Exhibit 08 (a print of christopherorloski.com). Mr. Orloski created his web site on his own to counter all of the false allegations hurled at him by governments over the years.

## 8.2   Mutual Exclusivity of Mental Illness and Terrorism

86.     Plaintiff argues that mental illness and terrorism are mutually exclusive. Plaintiff argues that a mentally disabled individual cannot be a terrorist. The reason is this. A mentally disabled individual is either: 1) Untreated and without wherewithal to make logical and rational decisions, 2) Experiencing withdrawal effects from

---

[11] See Exhibit 05, **Serpent in the Brain**, for specifics on how psychiatry and psychopharmaceuticals transform a law-abiding citizen into a nuisance-offender.

psychopharmaceuticals while under the care of psychiatry, or 3) Under the influence of psychopharmaceuticals prescribed by psychiatrists.

87.     Because any action of a mentally disabled individual is attributable to either his or her psychiatric illness or perpetual treatment by psychiatry (which provides no cure), a mentally disabled individual cannot be a terrorist.

88.     Therefore, Defendants' allegation that Mr. Orloski is a terrorist constitutes negligence, intentional misconduct and/or discrimination based on mental disability.

89.     If any reader still insists on believing that Mr. Orloski is a terrorist, then Mr. Orloski must refer that reader to the creators and modifiers of Mr. Orloski's behaviors from 1997 to 2018 so that the reader can take the issue up with those responsible—1) Mr. Orloski's psychiatric prescribers and 2) the manufacturers of psychopharmaceuticals, which Mr. Orloski has been prescribed and has been taking since 1997.

90.     See Exhibit 06 for a list of Mr. Orloski's prescribers, hospitalizations and psychopharmaceuticals prescribed. Note that, although Mr. Orloski sought a cure and preferred a cure, Mr. Orloski was never cured or presented with a cure by any prescriber or hospital. Because courts tend to hold the words of their darling forensic psychiatrists and the APA's DSM-5[12] as Truth in their judicial proceedings, Plaintiff's soiling and toxic-labeling of the godhead of psychiatry may seem controversial, alarming and even offensive to a judge. But, Plaintiff tells it like it is.

91.     Plaintiff concedes that he has committed nuisance offenses as a result of exposure to psychiatry. The offenses were exaggerated into ridiculously trumped-up

---

[12] American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition*

charges by law enforcement and prosecutors. Having incompetent and disinterested court-appointed counsel, Plaintiff was convicted of the trumped-up charges against which he could not defend on his own while sick, sedated with medication or under judicial guillotine of *mental incompetence to stand trial*. But, psychiatry and big pharma are the ones to be held to account for Plaintiff's underlying nuisance behaviors. The Truth about psychiatry is ugly and disturbing once one achieves a holistic picture.

92.     For Plaintiff's in-depth analysis of the failure of psychiatry, see Plaintiff's book ***Serpent in the Brain: An Analysis of the Destructive Force of the APA's DSM-5***, Exhibit 05. The relevance of ***Serpent in the Brain*** is that the information therein provides causal theory for Defendants' discrimination on basis of mental disability. At its core, this action is about mental health, not terrorism. ***Serpent in the Brain*** elaborates on Mr. Orloski's mental health story and serves as a rational argument for *separation of medicine and state.*

93.     Plaintiff may be wrong about the American medical establishment and its connection to Defendants' watchlists. If Plaintiff is wrong, he will make concessions. But if Plaintiff is right about the American medical establishment's complicity with and connection to the U.S. Intelligence Community, then Defendants and the field of psychiatry must make concessions.

94.     See Exhibit 07, ***Federal Terrorists***, a book authored by Mr. Orloski in 2016, which documents the criminal abuse he experienced under psychiatric care and associated confinement. ***Federal Terrorists*** also provides insights into the U.S. Intelligence Community's *modus operandi* of creating that which they are mandated to prevent, and that is relevant to understanding why the IC and Defendants would

deceitfully and/or negligently manage their terrorist watchlists. Is Plaintiff angry and vengeful about being abused by psychiatry? Of course. Plaintiff seeks justice just like any victim does, and he does so in case no. 8:18-cv-556-EAK-CPT (*Orloski v. American Psychiatric Association, et al.*) in the U.S. District Court for the Middle District of Florida Tampa Division. Vengeance (Justice) is the American way in any courtroom. Plaintiff wants his psychiatric abusers put away for their crimes just like any victim does.

## 8.3   With Great Power Comes Great Responsibility

95.    When an organization wields an apparatus of great power, the organization must exercise great responsibility in using that power.

96.    When Mr. Orloski studied tae kwon do in 1994, there was an adult black belt student at the dojo who bullied and intimidated Mr. Orloski and other students by axe-kicking inches away from their heads during warmups. The dojo's grandmaster was well aware of the bullying and so at a tournament, to humiliate the bully, the bully was paired in a sparring match with the grandmaster's 5-year-old son who was also a black belt. The crowd roared with laughter and delight, and the bully's face turned beet red as he was forced to show restraint while the tiny black belt pummeled the only thing within his reach—the bully's legs.

97.    In essence this civil action is such a tournament with the Court presiding.

## 8.4   Deceit by Defendants

98.    Plaintiff alleges that Defendants routinely deceive to achieve their goals.

99.    **First Deceit.** Defendants used deceit and weaponized information to classify Plaintiff as a Known or Suspected Terrorist.

100. **Second Deceit.** Defendants used deceit to invade, regime-topple and occupy the sovereign nation of Iraq in 2003. Iraq was invaded under false pretense. Deceptive reports of presence of weapons of mass destruction were used to justify invasion.

101. **Third Deceit.** Defendants in the future will use deceit to misreport to POTUS#45 (codename Stormy Assclown) that North Korea, China, Russia, Pakistan and Iran are not credible nuclear threats to the United States.

## 8.5 Consequences of Deceit by Defendants

102. Deceit by Defendants has real-world impact and consequences.

103. **First Consequence.** Plaintiff's freedom of movement internationally has been restricted, and he is bullied and surveilled domestically and internationally when he travels by air. If Plaintiff is told repeatedly enough times that he is a terrorist, will be become a terrorist? After all, Defendants' *modus operandi* follows the principle of creating the very thing, which they are mandated to prevent—terrorism and crime.

104. **Second Consequence.** U.S. invasion of Iraq under false pretense cost thirty-five thousand lives, cost the U.S. taxpayers trillions of dollars and spawned the Islamic State—an example of Defendants and the U.S. Intelligence Community creating the very thing, which they are mandated to prevent—terrorism and crime.[13]

105. **Third Consequence.** This result is a prediction and, in any case, a consequence of Defendants' deceit. When Defendants in the future choose deceitfully to misreport to President Assclown (codename Special Needs) the nuclear threat posed

---

[13] Plaintiff reminds the Court of the fruits of the IC's deceit—San Bernardino 2015DEC02 and Orlando 2016JUN12.

by North Korea, China, Russia, Pakistan and Iran, Washington, D.C. will be god-smacked by a nuclear weapon. *Self-immolation is the fruit of Defendants' deceit.*

### 8.6 Defendants May Be the Terrorists in This Case

106.   It could become factual as this proceeding unfolds that Defendants, not Plaintiff, are the true terrorists. Defendants would be terrorists through proxy of others, but indeed still *the* terrorists. Defendants would likely argue that that terrorism through puppeteering-proxy is the preferred type of terrorism because the terror takes place without directly bloodying the puppeteers' hands. Defendants are feeling quite bad-ass that they hold the puppet strings to Islamic State puppets, which Defendants spawned around the globe.

### 8.7 Better Use of Taxpayer Funds

107.   The U.S. Government and Defendants have better things to do with taxpayers' money than surveil Plaintiff and assassinate his character worldwide.

## 9   Facts

### 9.1 Introduction

108.   The core issues of this complaint are torts resulting from bullying through proxy by Defendants; Defendants' bullying through proxy has wide-ranging effects on Plaintiff's liberty and freedom of movement domestically and internationally.

109.   TSA, Southwest Airlines and other end-users of TSDB and TIDE data cannot be held responsible for the resulting injuries, intimidation and discrimination on the basis of Mr. Orloski's disability. TSA and the airlines act on information provided to

24

them by Defendants. The cause of injuries, intimidation and disability discrimination is rooted in the lies, erroneous information, omissions and the persistent KST status in TSDB and TIDE orchestrated by Defendants.

110.    Defendants are ultimately responsible for processing intelligence and generating and maintaining records in the TSDB and TIDE databases based on erroneous, omitted or purposely fictitious or falsified data.

111.    The Defendants' intimidation tactics and discrimination in Plaintiff's situation include:

1) Intentional and/or erroneous classification of Plaintiff as a Known or Suspected Terrorist;

2) Bullying through proxy by causing various agencies domestically (including the TSA) and abroad (including London's Metropolitan Police) to screen and scrutinize Plaintiff more than other individuals who are receiving the same services such as air travel;

3) Directing individuals who wish to contest their derogatory classification in TSDB and TIDE to DHS TRIP (Traveler Redress Inquiry Program) for a redress control number, which, in Plaintiff's situation, has no effect on Plaintiff's KST status or the screening of Plaintiff by TSA and other agencies;

4) Prevention by TSC and NCTC of direct public access for Plaintiff to make an inquiry, file a grievance or complaint or to seek remedy for an erroneous classification in the TSDB and TIDE databases;

5) Interfering with Plaintiff's civil liberties, freedom of speech and enjoyment of air travel at home and abroad;

25

6) Weaponization of information and sharing weaponized information globally, leading to character assassination of Plaintiff worldwide

## 9.2  Exhaustion of Administrative Remedies

112.   Plaintiff has exhausted his administrative remedies. Plaintiff filed administrative claims with Offices of the General Counsel of Defendants FBI/TSC and ODNI/NCTC using the required FTCA/DOJ Standard Form-95.  See Exhibit 02 for Plaintiff's administrative claims and postal receipts with tracking numbers.

113.   Plaintiff's administrative claims were mailed by certified U.S. Postal Service mail[14] on September 19, 2017 and received by Defendants' Offices of the General Counsel[15] on September 25, 2017. Defendants FBI and ODNI failed to respond to Plaintiff by March 25, 2018 (six months from receipt of administrative claims).

114.   Therefore, Plaintiff has exhausted his administrative remedies through non-response by Defendants within the six-month period prescribed by the FTCA.

## 9.3  Characteristics of Defendants

---

[14] To FBI/TSC (Mr. Jim Agar, U.S. Department of Justice, Federal Bureau of Investigation, Office of the General Counsel, Civil Litigation Department, 935 Pennsylvania Ave NW, Room 7427, Washington, DC 20535-0001): USPS tracking number **9507 1000 3203 7262 0000 25**. To ODNI/NCTC (Office of the Director of National Intelligence, Office of the General Counsel, Washington, DC 20511): USPS tracking number **9507 1000 3203 7261 0001 94**. The USPS web site (http://usps.com) does not report delivery of certified packages to the ODNI. Plaintiff, as a test, sent a second copy of his administrative claim via certified USPS to the ODNI on October 3, 2017, tracking number **9590 9402 3020 7124 7776 37**. The USPS web site reported on January 1, 2018 for the first package: It is on its way to WASHINGTON, DC 20511. … Status: In Transit, Delayed; the report for the second package to the ODNI was similar.
[15] The package was received by the FBI on September 25, 2017 according to usps.com. Since USPS does not report receipt of packages by the ODNI, it can only be assumed that the package was received by the ODNI's Office of the General Counsel on the same date, September 25, 2017.

115.    Defendants are bullies who answer to no one, with exception to Defendant FDLE, who does respond to public records requests[16].

116.    Defendants are secretive and conduct their bullying behind curtains of federal law and national security, which make their brand of bullying extremely difficult to address, except though the power of the Court.

117.    It is assumed that Defendants, being part of the U.S. Intelligence Community and the first responder community, have the intelligence to predict the consequences of classifying a mentally disabled individual as a KST and broadcasting that status globally. Defendants must be aware that the result of Plaintiff's classification as a KST in TIDE and TSDB is interference with civil liberties, freedom of speech, freedom of movement and restriction of air travel privileges worldwide.

118.    Defendants, according to CBP in February 2015, are aware of Plaintiff's mental disability. Defendants know that by erroneously classifying Plaintiff as a KST, Plaintiff will encounter situations at airports and other places that will result in psychiatric injuries, emotional distress and exacerbation of Plaintiff's mental disability.

119.    Defendants may be obfuscating.

## 9.4   An Overview of How the Terrorist Screening Database Works

120.    The Terrorist Screening Database (TSDB), commonly known as a terrorist watchlist or simply "the watchlist", is a data warehouse which contains and serves up to end-users information about Known or Suspected Terrorists (KSTs) in response to screening queries. The TSDB maintains at least two lists of individuals: the **no-fly list**

---

[16] However, FDLE refuses to provide "active criminal investigative or intelligence information" in accordance with Section 119.071(2)(c)1., Florida Statutes.

and the **automatic selectee list**. The TSDB is managed and administered by the Terrorist Screening Center (TSC), a multi-agency organization under the control of the FBI. The TSC was created under Homeland Security Presidential Directive-6 (HSPD-6) of the George W. Bush dynastic regime on September 16, 2003. The creation of the TSC and TSDB are direct responses by the U.S. Government to the attacks on the United States on September 11, 2001, which Plaintiff asserts the Bushes intentionally let slip through. But, that's another civil action entirely against Defendants' 2001 POTUS#43 George Nukyooler-Moron Iraq-War-Criminal Walker Bush and his ex-CIA-Director-POTUS#41 Turd-Blossom-Father George Herbert Walker Bush...

> The TSDB includes biographic identifiers for those either to have or be suspected of having ties to terrorism. In some instances it also includes biometric information on such people. It stores hundreds of thousands of unique identities. Portions of the TSDB are exported to data systems in federal agencies that perform screening activities such as background checks, reviewing the records of passport and visa applicants, official encounters with travelers at U.S. border crossings and air passenger screening.[17]
>
> U.S. Government agencies nominate individuals who may qualify for inclusion as a known or suspected terrorist based on credible intelligence developed by homeland security, law enforcement, the Intelligence Community, as well as U.S. Embassies or Consulates. The nominations are submitted to the National Counterterrorism Center, which determines if the information is credible and if there is sufficient identifying information. If so, the nomination is entered into the Terrorist Identities Datamart Environment [TIDE] and the identity information is passed to the Terrorist Screening Center (TSC). The TSC then conducts another review of the nomination and

---

[17] Congressional Research Service (www.crs.gov), The Terrorist Screening Database and Preventing Terrorist Travel, November 7, 2016, (https://fas.org/sgp/crs/terror/R44678.pdf)

the relevant intelligence to verify the information
before accepting the record into the TSDB.[18]

121.   The process by which a U.S. citizen or foreign national becomes a KST in
the TSDB and by which the end-users use the data for screening involves six steps:

1) Nomination of an individual by intelligence agencies or law enforcement
   agencies to the NCTC

2) Vetting and addition of an individual to TIDE

3) Vetting and classification of an individual as a KST by TSC

4) Verification of the KST's identity by TSC

5) Export of the TSDB data to end-users of screening systems

6) Screening by end-users, also known as screeners, to determine whether an
   individual is a KST and therefore disqualified from specific services or
   opportunities

122.   Evidence of an unfettered expansionist policy of the Terrorist Screening
Center and its affiliated organizations exists. From 2009 to 2013 the number of new
nominations (of individuals) by the TSDB rose exponentially from 227,932 in 2009 to
468,749 in 2013, an increase of 206% in 4 years. The rejection rate (of nominees for
terrorist classification) in 2009 was 0.22%. In 2013 the rejection rate was 1.05%. Thus,
nearly every individual nominated to the TSC by U.S. law enforcement agencies is
classified as a KST. It's a case of girls gone wild on Bourbon Street on Fat Tuesday in
New Orleans. Using extrapolation of the 2009-2013 data presented in the
Congressional Research Service's 2016 report, Plaintiff estimates that 5.8 million
individuals were nominated between 2003 and 2017. Plaintiff estimates that 5.7 million
of the nominees were vetted as KSTs and now reside as KSTs in the TSDB.

---

[18] TSC's FAQ page 2 (https://www.fbi.gov/file-repository/terrorist-screening-center-frequently-asked-questions.pdf)

SINCE THIS ATTACHMENT CONTAINS A PERSONAL
IDENTIFIER IT IS NOT SCANNED AND IS LOCATED IN
THE CLERK'S OFFICE.

125.    In September 2017, Mr. Orloski applied for and received a new U.S. passport and U.S. passport card. In part, Mr. Orloski renewed his passport 2 years early to test whether he was eligible to be a passport holder and whether his identity documents had been weaponized (made revocable) by Defendants through proxy of the U.S. State Department. Mr. Orloski is still an American citizen, free to travel abroad, for now at least.

## 9.6  A 2015 Encounter with CBP and HSI Indicating FDLE as a Tortfeasor

126.    On February 6, 2015, Customs and Border Protection (CBP) agents seized all of Mr. Orloski's electronics and computer equipment. An explanation for the seizure was not given, but the CBP agents did state that "Homeland Security" takes threats seriously and that "FDLE" had reported a threat about (DHS Director) "Jeh Johnson". The CBP agents also stated to Mr. Orloski that they were aware of Mr. Orloski's "medical condition" (his disability). Based on this information provided to Mr. Orloski by CBP agents in 2015 and based on air travel difficulties in July 2017, Mr. Orloski concluded in 2017 that his probable presence in TSC's TSDB was a result of action by FDLE and perhaps other law enforcement agencies including DHS and HSI.

127.    Mr. Orloski believes, but cannot definitively prove without requests for discovery to Defendants to produce the facts and evidence, that Defendant FDLE nominated Mr. Orloski to the National Counterterrorism Center or the Terrorist Screening Center in 2014. At this point Mr. Orloski's evidence is circumstantial. Mr. Orloski further believes, but cannot definitively prove without requests for discovery to Defendants to produce the facts and evidence, that Defendants FBI, ODNI, NCTC and TSC vetted Mr. Orloski as a KST in the TSDB and TIDE databases all in violation of tort

law, the ACAA, 18 U.S.C. § 1001, 18 U.S.C. § 1038 and the First Amendment. Mr. Orloski believes that the cause of his extended screening by TSA and airlines is due to data and records persisting in the TSDB and TIDE databases.

### 9.7  TSA's Extended Screening Is Battery through Proxy

128.  Plaintiff alleges that TSA's extended screening procedures, invoked by Plaintiff's status as a KST in TSDB and TIDE, constitute battery through proxy. See Exhibit 03 for Plaintiff's Affidavit and description of TSA's touchy-invasive extended screening procedure.

### 9.8  A Redress Control Number

129.  Mr. Orloski applied in 2015 and 2017 for redress control numbers from DHS TRIP (Traveler Redress Inquiry Program). Mr. Orloski received a redress control number (2218084) in 2015, but it had no effect on his status as a KST. Mr. Orloski reapplied to DHS TRIP and received a second redress control number (2259108) in 2017. Provision of the redress control numbers to the airlines on which Mr. Orloski flew had no alleviating effect on the difficulties Mr. Orloski had with air travel and extended screening by TSA.

### 9.9  Mr. Orloski's Disability

130.  Mr. Orloski is a 49-year old disabled person who suffers from chronic mental illness (schizoaffective disorder) and physiological illnesses (diabetes mellitus type 2, obesity, hypertension, hypothyroidism and peripheral diabetic neuropathy—all side effects of psychiatric medications). Mr. Orloski's mental impairments substantially limit his major life activities. Mr. Orloski's illness is severe enough to have warranted 9

32

psychiatric hospitalizations from 2000 to 2015, the longest hospitalization being 15 months. Mr. Orloski is disabled within the definitions of the Americans with Disabilities Act, Rehabilitation Act, Fair Housing Act, Air Carrier Access Act and other federal statutes. Mr. Orloski became disabled under the Social Security Administration's (SSA's) rules on December 2, 2006, and he has received disability benefits since November 2007 (7 years before he was classified as a terrorist by Defendants). SSA determined Mr. Orloski's disability to be continuing on August 1, 2016.

## 9.10 Mr. Orloski's Psychotic Episode from July 2013 to December 2015

131.   Mr. Orloski was tapered off all of his psychiatric medications by his prescriber, Dr. Chanel Helgason, in July 2013. Mr. Orloski experienced psychopharmaceutical withdrawal symptoms and suffered a psychiatric episode lasting 18 months from July 2013 to December 2015.

## 9.11 A Suspected Terrorist in Tampa and Boston in 2015

132.   Mr. Orloski first learned of his possible presence on a watchlist on April 11, 2015 when he flew from Tampa International Airport (TPA) to Boston Logan International Airport (BOS). At TPA Mr. Orloski received an "SSSS" marking on his boarding pass and was subjected to extended screening by the TSA officers. The extended screening by TSA occurred again in Boston because Mr. Orloski's boarding pass from Iceland's Wow Air was also marked with "SSSS". And at Mr. Orloski's gate in Boston Logan International (BOS), CBP agents searched Mr. Orloski's backpack and property again before he boarded his flight to Keflavík Airport (KEF) in Iceland. Mr. Orloski was puzzled at the time that he was being singled out for extended screening.

133.   For Mr. Orloski's boarding passes, see Exhibit 01 at page 1.

33

**SINCE THIS ATTACHMENT CONTAINS A PERSONAL IDENTIFIER IT IS NOT SCANNED AND IS LOCATED IN THE CLERK'S OFFICE.**

136.    When Mr. Orloski realized that he was being bullied by U.S. Homeland Security and that the bullying was impacting his freedom of movement internationally, he sought protection of the Icelandic government in April 2015.

137.    Mr. Orloski's statement to the Icelandic Immigration Directorate excerpted herein addresses deceit by U.S. (state and federal) law enforcement over the years. The relevance of inclusion of Mr. Orloski's interview excerpt is to demonstrate a pattern of deceit by state and federal law enforcement and the snowball effect which has culminated in Defendants' lies and/or negligent omissions described in this complaint.

138.    The following is a translation of an interview of Mr. Orloski by the Icelandic Immigration Directorate's immigration officer, Eiríkur Ari Eiríksson, on April 20, 2015:

> *Now we will go over the reasons why you've fled from your home country, and why you're applying for asylum. The Applicant is asked to provide a chronology in as much detail as possible yet give the interpreter the opportunity to interpret what you say. The Applicant is reminded of the importance of truthfulness and not to omit critical information about his case in this section.*
>
> **What events in your life made you flee from your home country?**
> I have been bullied by the United States government and have had to endure the bullying for 18 years. I've been subjected to this bullying by both the federal government and state governments. Authorities use various methods of bullying and discriminate based on mental health problems. They put me in prison using these methods of bullying. Deception and deprivation of liberty are the primary methods of governmental bullying. Recently the governments have changed their approach to cyber-bullying. I am currently listed in a Homeland Security database as a threat to state security. When I arrived back in the United States from the United Kingdom in February 2015, I learned of this status because all of my electronic devices, computers, mobile phones, camera, all electronic devices, software and everything were forcefully taken from me. The U.S. Government destroyed my computer when they tried to access it. I would also like to add that the official reports in the Homeland Security databases are beginning to affect my life elsewhere, outside the United States, for example in the UK, where I been subjected to similar brutal treatment. According to Homeland Security, I am a danger to the public, but they are mistaken. The Homeland Security's false reports have very serious consequences for me, and they use this information against me. When I came to the UK, I stayed overnight at the airport, I was charged with

35

the possession of a small pocket knife. But the basis of this criminal charge was the result of information about me that came from Homeland Security. My experiences with the UK government in the UK made me realize that I'm in danger of being bullied elsewhere in the world. The risk of deprivation of liberty is based on lies. This in essence is the reason I am applying for asylum in Iceland. I am willing to go into further detail if so required. I also fear that if I return to U.S., I will have precisely the same problems again, for example my property will be taken, and I will be deprived of liberty and experience psychiatric and emotional harm. I would like to refer you to a computer data DVD that I am presenting. You will find detailed information that further illustrates the story that I am presenting, including my federal court case[20] that I filed against Homeland Security regarding false information that they store about me in their database.

*Are those legal proceedings still in progress?*
The litigation is ongoing.

*When did you file your case against Homeland Security?*
March 16, 2015.

*Do you fear for your life or violence in your home country?*
Yes. I fear violence through deprivation of liberty. There is a lot of violence in the prison systems. There is a great vulnerability to violence in these situations. It only takes one tiny lie by the government for such a situation to occur. I managed to stop the government's attempt to lie when they took my property. It took a federal lawsuit to stop the lie; this is the case that began March 16, 2015. Five hours after the complaint was filed, all of my property was returned. Thus, I managed to stop the federal government from creating a case against me based on deception.

*Do you fear the same situation again were you to return to your home country?*
Yes. Because Homeland Security's information about me persists in their database, nothing has changed.

*Do you fear being placed in prison?*
Yes.

*Is your family in danger?*
No. But, my mother had a car accident, sometime around 2012. The police who investigated the case said my mother had caused the accident, but that was false. She was hit from behind, yet she was still blamed for the accident.

---

[20] *Orloski v. U.S. Department of Homeland Security, et al.*, case no. 8:15-cv-570-SDM-MAP, U.S. District Court for the Middle District of Florida Tampa Division

***This harassment you are experiencing in your home country, do you think it will continue, no matter what state you would live in?***
Without a doubt. I reiterate that I felt this also in the UK, so this is a problem following me around the rest of the world as well.

***I asked you earlier if you had ever been convicted of a criminal offense, been indicted or whether the case had been brought against you, and you answered yes. Can you elaborate further on this?***
The first case was in 1999 in Texas where I was charged for reporting a fire when there was no fire. I wish to clarify that at this time, that I was on medication for mental illness, and as a result of this, my disruptive behavior had increased significantly. My behavioral problems increased due to psychiatric treatment. I believe that the police were concerned about my actions and retaliated because I was investigating the police. They were going to charge me with other offenses, but they could not because I had video of the police's actions. Regarding the case in 2007, there are references on my data DVD to that case. I was accused of a threat to use a chemical weapon. It is an absolute lie. What happened in reality was that I left some trash on the lawn of Capitol Hill in Washington, but was charged for a threat to use a chemical weapon. I was confined for 17 months. To be specific about the lies, one example is that in that trash there was a bottle of water, which the police claimed contained the window cleaner Windex. But Windex, however, is blue, not clear like water. This case is a clear example of how dangerous the government's lies are. I was placed inside the locked ward in a psychiatric facility for 17 months for psychiatric evaluation. My lawyer told me that had I entered a guilty plea up front, I would have served 8 months instead of 17 months of evaluation in a mental hospital.

***Are there further issues?***
There are three issues that I would regard as major issues, and I have to mention one additional issue. The others are minor, such as traffic fines and minor offenses. After my first experience with law enforcement and the judicial system in Texas, I was motivated to investigate, specifically to investigate the police, to determine the source of the corruption. So, I did. Following this, I began a self-directed investigation at the Courthouse and obtained copies of the District Attorney's data without their permission or knowledge. I went to war with the county's prosecutor. I presented this data to the Federal Bureau of Investigation (FBI). I also made copies for the courts, which were in the same building as the District Attorney. This was in 2000. I was accused and indicted on two charges. The first was burglary of a building, the Courthouse, and the second was breach of computer security. The financial damage was estimated in the range of 20,000 to 100,000 U.S. dollars. And herein lies the first lie because I did not cause any financial damage. There was no financial loss. They created a figure of financial loss by calculating the costs of the investigators' time used to investigate the case. The government further built their case on additional false statements. They

argued that a CD was imprinted with my palm print, but it was impossible. I know that I was responsible for accessing data in their computer systems, but the purpose was to perform a public good and to demonstrate the corruption in the police and courts. My attempt to serve the public interest led to two years of deprivation of liberty.

*And what form was your deprivation of liberty?*
I was on the psychiatric ward, being evaluated until I pleaded guilty. I was there from 2000 to 2002.

*Until you pleaded guilty?*
In the United States this is how it works. You are detained for psychiatric evaluation until you admit guilt. It was not until after I had been shuffled back and forth between psychiatric hospital and jail for two years that I had had enough and admitted guilt. Thus, I was convicted. After I admitted guilt, I had two weeks remaining to serve, and I was released. I'd like to add that had I not confessed, I would still be sitting there today. This is probably one of the best examples I can give as to the bullying I experienced and the abuse of power by the government. Psychiatric evaluation is one of the primary tools the government uses to guide a case in the direction they want it to go.

*Was there any particular reason why you were trying to investigate the police in this time?*
Yes. I thought at the time that the police were engaged in illegal activity in my neighborhood. The police were participating in it, so I tried to investigate and I shot video of what I saw. The experience I gained in this case demonstrated the corruption, abuse of power and the ugliness of the government. This led me to want to investigate the police further.

*At present, as you described above, you have been diagnosed with schizoaffective disorder in 1997 and are receiving therapy. Did something significant happen in 1997?*
I don't recall anything special happening. People may have no explanation of the source of their mental disorders. There is an argument that psychiatric illness is rooted in undiagnosed physical illness, for example, I have allergies and overproduction of histamine in the body, but no one knows the real cause of psychiatric illness.

*Have you received throughout the years, in your opinion, appropriate medical assistance in your country?*
No, to the contrary.

## 9.14 A Suspected Terrorist in Florida and Colorado in 2017

139.   On July 19, 2017 Mr. Orloski flew on Southwest Airlines from Tampa International Airport (TPA) to Denver International Airport (DEN); Mr. Orloski made the return trip on Southwest Airlines on July 26, 2017. Mr. Orloski's status as a KST in TSDB and TIDE prevented timely receipt of boarding passes within 24 hours of his flights and caused extended screening by TSA at both departing airports, both at the security checkpoint and gateside. Mr. Orloski received Quad S ("SSSS") status on both of his boarding passes, indicating his persistent status as a KST.

140.   For Mr. Orloski's boarding passes, see Exhibit 01 at pages 3-4.

141.   For an affidavit and description of Mr. Orloski's experience with TSA's extended screening procedure, see Exhibit 03.

## 9.15 A Suspected Terrorist in Florida and Colorado in 2018

142.   On January 10, 2018 Mr. Orloski flew on Southwest Airlines from Tampa International Airport to Denver International Airport; Mr. Orloski made the return trip on Southwest Airlines on January 17, 2018. Mr. Orloski's status as a KST in TSDB and TIDE prevented timely receipt of boarding passes within 24 hours of his flights and caused extended screening by TSA at both departing airports, both at the security checkpoint and gateside. Mr. Orloski received Quad S ("SSSS") status on both of his boarding passes, indicating his persistent status as a KST.

143.   For Mr. Orloski's boarding passes, see Exhibit 01 at page 5.

144.   For an affidavit and description of Mr. Orloski's experience with TSA's extended screening procedure, see Exhibit 03.

## 9.16 It Is Outrageous That Mr. Orloski's Cat, Copernicus Storm, Is Also a Terrorist in TSDB and TIDE

39

145.   In January 2017 Mr. Orloski rescued and adopted a 10-year old male American medium hair cat named Storm. Storm was in the Largo, Florida SPCA shelter for 5 months because nobody wanted him. Mr. Orloski empathized and understood Storm's situation, because like Storm, Mr. Orloski has in his life been abandoned and relegated to diabolical places of confinement. Storm purred and gave Mr. Orloski several kisses on his hand, and by evening Storm was home with Mr. Orloski.



*Storm's ID*

146.   Storm is a terrorist when it comes to strings and carpet edges. Storm has an affinity for strings and anything that looks like a string such as phone charging cords, cables and even long slender sticks. Storm viciously bites and gnaws on strings until he's chewed them into pieces. The drawstrings on Mr. Orloski's Venetian blinds have suffered multiple attacks which required replacement of the blinds. Storm claws at the edges of the carpet until the carpet fibers are exposed. He then makes strings that he

can chew on and swallow, which is very, very naughty. So, as a safety measure against Storm's terrorism and possible self-harm, Mr. Orloski must string-proof the house.

147.   Storm is truly a naughty terrorist, who sleeps 23 hours per day in his various beds, boxes and baskets about the house. Storm's identity likely resides in both TSDB and TIDE databases. His full name is Copernicus Storm (formerly known under the dodgy alias of 'Bean' at the SPCA shelter). His DOB is August 18, 2006. He has yellow eyes, white and tan fur, a striped tail and weighs 17 lbs for biometric purposes.

148.   Were Storm to travel by air with Mr. Orloski as his ESA, Storm would likely undergo extended screening by TSA, and that would be stressful and traumatic for the kitty, just as it is for Storm's caregiver, Mr. Orloski. Storm might scratch TSA's eyes out while being involuntarily held and upon hearing his caregiver whisper "kiss-kiss".

149.   Without fail, *every* morning Storm jumps on Mr. Orloski's bed while he's asleep and licks Mr. Orloski's face to wake him up to fix Storm's breakfast. Usually this terroristic act, which threatens national security, occurs around 8 AM, but Mr. Orloski's feline alarm clock is known to go off causing somnolescent discomfort as early as 5 AM.



*← Chris and Storm, two "terrorists", at least according to TIDE/TSDB in 2018*
*Storm, a sleepy "terrorist" who dreams of Friskies salmon pâté and Goodlife kibble →*

150.   Storm is happy to be loved, is happy to live in a good home where he can do as he pleases, is happy to get plenty of loving, brushing and petting, is happy to get three meals per day (plus snacks!) and is happy to sleep whenever he wants to.



151.   Storm is very content to snooze in his TrustyPup bed on Mr. Orloski's IKEA bed while Mr. Orloski watches German Bundesliga soccer matches on the Fox Soccer Match Pass channel on his Roku Ultra box.



152.   Yes, Storm's classification as a terrorist is as outrageous as Mr. Orloski's classification as a terrorist. The relevance of exercising sarcasm against the bullies (Defendants) in this proceeding is obvious—to teach them a lesson. Two things that bullies hate the most are being ridiculed and being humiliated. Also, a key element of an

IIED claim is a defendant's extreme and outrageous conduct. Classification of a mentally disabled individual (or his cat) as a terrorist is outrageous.

## 9.17 Mr. Orloski's Injuries

### 9.17.1 Deprivation of Liberty in the United Kingdom in 2014

153.   On April 30, 2014 Mr. Orloski was arrested by London's Metropolitan Police at London Heathrow Airport (LHR) in London, England, UK for having a pocket knife in his backpack. Mr. Orloski had overnighted at Heathrow Airport, and despite Mr. Orloski's just-prior efforts to have himself voluntarily admitted to a psychiatric hospital to receive treatment for his psychosis and suicidality, he was turned away by the UK's National Health Service (NHS) (and NHS' A&Es [Accident & Emergency rooms, the British term for ERs]) nine times and forced to choose between sleeping at the airport or under a bridge along a canal under Dawley Road in Hayes. Mr. Orloski spent two nights under the bridge on Dawley Road, then headed to Heathrow Airport by bus on April 29, 2014.

154.   Although having a pocket knife in a backpack is considered a crime of "offensive weapon" in the UK, it was Metropolitan Police's receipt of derogatory information from DHS (and Defendants' databases) that persuaded Metropolitan Police to charge Mr. Orloski with an offense rather than help him get mental health treatment. As this type of abuse in the UK is paralleled identically by U.S. law enforcement and the U.S. healthcare infrastructure, the Court will have no problem in understanding Mr. Orloski's dilemma at the time—he sought help but couldn't get it, and instead he was arrested.

155.  Metropolitan Police Officer MARK SANNA, the arresting officer, expressed his view that Mr. Orloski's pocket knife would likely be confiscated by the police and Mr. Orloski would be released with a warning and without charge.

156.  The possibility of Mr. Orloski's release with a warning changed when the Metropolitan Police detectives contacted DHS. DHS put their thumbs on the scale, and as a result of information provided by DHS (and Defendants' databases) to Metropolitan Police, Mr. Orloski was deprived of his liberty for 9 months from April 30, 2014 to February 5, 2015. While confined in the UK, Mr. Orloski was abused and tortured for 9 months at the hands of Her Majesty's Prisons (HMP) and the National Health Service (NHS)[21]. The treatment by HMP and NHS was so heinous and injurious that Mr. Orloski attempted suicide twice by placing a bag over his head and by drinking milk contaminated with feces. On February 5, 2015 Mr. Orloski was deported from the UK and forbidden to return.

157.  Plaintiff attributes his inextricable entanglement with UK law enforcement, UK imprisonment and deportation from the UK to Defendants' classification of Mr. Orloski as a KST.

### 9.17.2 Exacerbation of Mr. Orloski's Mental Disability

158.  Mr. Orloski already suffers from his mental impairments in the form of severe depression, suicidality, hopelessness, psychosis, delusions and other psychiatric symptoms. Defendants' actions through proxies such as TSA, airlines, London's Metropolitan Police, HSI and CBP exacerbate Mr. Orloski's suffering due to effects of

---

[21] See Chapter 23 (The Purple Glove Goon Squad) at pages 77-80 in Exhibit 07, *Federal Terrorists*, a book authored by Plaintiff in 2016.

extreme stress that the TSA/CBP screenings and HSI investigations impose on Mr. Orloski including emotional distress, absolute humiliation from being considered a terrorist by the U.S. Government and other national governments, mental anguish, extreme anxiety, paranoia, profuse sweating, a fight-or-flight response and violation of his civil liberties (First Amendment freedom of speech).

159. In doing the acts of which Plaintiff complains, Defendants conducted themselves in the manner of a bully with nefarious disregard of the requirements of tort law, the ACAA, 18 U.S.C. § 1001, 18 U.S.C. § 1038 and the First Amendment. These statutes explicitly prohibit tortious conduct, false reporting and discrimination on the basis of disability and intimidation of individuals with disabilities.

160. Because Defendants have departed from their obligations under federal law and tort law, there is an actual controversy between the parties. Accordingly, Plaintiff is entitled to declaratory relief.

161. Unless ordered by the Court, Defendants will discreetly and openly through proxy continue to engage in the unlawful acts, negligence, intentional misconduct and/or deceit in violation federal law and tort law described above. Mr. Orloski, for reasons described herein, has no other adequate remedy other than judicial relief as ordered by this Court.

162. Plaintiff is now suffering, and will continue to suffer, irreparable injury from Defendants' unlawful acts unless relief is provided by the Court. Accordingly, Plaintiff is entitled to injunctive relief.

# 10 Claims for Relief

## 10.1 Count 1: Claim of Negligence in Violation of Florida Tort Law

163.    Defendants are in violation of § 768.041 *et al.,* Florida Statutes. By using deceptive information, by omitting relevant intelligence and by classifying Plaintiff as a KST, Defendants were negligent, grossly negligent and continue to be grossly negligent.

## 10.2 Count 2: Claim of Intentional Infliction of Emotional Distress in Violation of Florida Tort Law

164.    By classifying Plaintiff as a KST, by committing battery through proxy by TSA and by harassing Plaintiff through airline proxies, Defendants maliciously and intentionally inflicted emotional distress upon Plaintiff in violation of Florida tort law. Liability may be imposed when defendants, by extreme and outrageous conduct intentionally or recklessly, cause severe emotional distress to a plaintiff. *LeGrande v. Emmanuel*, 889 So.2d 991 (Fla. 3rd DCA 2004); *Gallogly v. Rodriguez*, 970 So.2d 470 (Fla. 2nd DCA 2007); *Donigan v. Nevins*, 785 So. 2d 573 (Fla. 4th DCA 2001).

## 10.3 Count 3: Claim of Battery through Proxy in Violation of Florida Tort Law

165.    Defendants have battered Plaintiff through proxy; Defendants' actions and classification of Plaintiff as a KST have caused TSA to touch and grope every part and every sensitive area of Plaintiff's body thereby terrorizing him during extended screenings at airport security checkpoints and terminal gates.

## 10.4 Count 4: Claim of Intentional Misconduct in Violation of Florida Tort Law

166.     Defendants have engaged in intentional misconduct as defined by § 768.72(2)(a), Florida Statutes[22]. Defendants were aware of Plaintiff's mental illness and disability, and they reasonably knew that his classification as a KST would cause psychiatric harm to him through proxy of screeners. Defendants were intentional and calculating in their causation of Plaintiff's injuries.

## 10.5 Count 5: Claim of Gross Negligence in Violation of Florida Tort Law

167.     Defendants have engaged in gross negligence as defined by § 768.72(2)(b), Florida Statutes[23].

168.     After receiving copies of Plaintiff's complaint in his original civil action[24] against Defendants, Defendants refused to withdraw Plaintiff's status as a KST in TSDB and TIDE. This constitutes gross negligence by Defendants with respect to Plaintiff's civil liberties and freedom of speech.

## 10.6 Count 6: Violations of the Air Carrier Access Act of 1986 (ACAA) through Proxy

169.     Defendants have violated the ACAA, 49 U.S.C. § 41705. Because Defendants are aware of the consequences of their data-sharing on air travel by individuals with mental disabilities and because they have the intent of restricting civil

---

[22] 768.72(2)(a), Florida Statutes: "Intentional misconduct" means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.

[23] 768.72(2)(b), Florida Statutes: "Gross negligence" means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or **rights of persons exposed to such conduct**.

[24] *Orloski v. Terrorist Screening Center, et al.*, case no. 8:17-cv-1815-VMC-AAS, U.S. District Court for the Middle District of Florida Tampa Division

liberties and air travel by individuals with mental disabilities, including Plaintiff, the Defendants discriminate on the basis of disability in violation of the ACAA.

170.   Specifically, the ACAA prohibits discrimination based on disability, and although the ACAA does not specify discrimination by intelligence agencies through proxy (of airlines and TSA), the Court will find that such discrimination through proxy is likely prohibited by the ACAA.

## 10.7 Count 7: Violations of 18 U.S.C. § 1001 by Defendants

171.   Defendants are in violation of 18 U.S.C. § 1001(a)(1,2,3), which prohibits false statements to federal government agencies and administrative departments.

## 10.8 Count 8: Violations of 18 U.S.C. § 1038 by Defendants

172.   Defendants are in violation of 18 U.S.C. § 1038(a,b) in conjunction with 18 U.S.C Chapter 40 § 842 (Importation, Manufacture, Distribution and Storage of Explosive Materials) and in conjunction with 18 U.S.C. Chapter 113B (Terrorism)(specifically 18 U.S.C. § 2332f (Bombings of places of public use, government facilities, public transportation systems and infrastructure facilities)). Defendants through proxy of TSA and airlines[25] are conveying false and misleading information that falsely suggests Plaintiff is engaging in or planning to engage in activities in violation of 18 U.S.C. Chapters 40 and 113B, namely terrorism and detonation of bombs in the air transportation system. The actions of TSA by swabbing Plaintiff's property for chemical (explosive) residue during extended screenings indicate that TSA (via TSC and NCTC) believes that Plaintiff is a credible terroristic threat

---

[25] Domestically (JetBlue, Southwest Airlines) and internationally (in Iceland—Icelandair, Wow Airlines)

against the air transportation system. That constitutes perpetration of a hoax by Defendants in violation of 18 U.S.C. § 1038.

173.    Because Defendants have also violated 18 U.S.C. § 1001, their investigative, protective and intelligence activities are therefore unlawful, and 18 U.S.C. § 1038(d) does not protect the Defendants from lawsuit or liability for their unlawful actions.

## 10.9 Count 9: Violations of the First Amendment to the U.S. Constitution

174.    Defendants have violated Plaintiff's freedom of speech protected by the First Amendment to the U.S. Constitution. The question before the Court is whether a mentally disabled individual's speech is protected while he or she is in a state of delusional psychosis and how such incoherent speech should be treated. Plaintiff may have, while in a state of delusional psychosis, generated reports or communication or works of art, which may have been offensive to others.

175.    The nature of Plaintiff's illness is that he believes that he is a Constitutional Defender and an internal affairs officer (and/or security auditor) sanctioned and authorized to investigate any government agency or department, including the intelligence agencies and law enforcement agencies. Part of Plaintiff's delusion is that he believes that he can audit and/or investigate agencies remotely by using his immediate environment to see into a target environment. Thus, Plaintiff erroneously believes that during periods of confinement, he is just doing his job by guiding covert operatives in the field who are also confined.

176.    And, while in psychosis, Plaintiff is known to send his delusional art and irrational reports globally by email. The reports typically consist of non-sensical collages

of photos, graphical images and text patched together in Adobe Photoshop or other image editors. The reports are encrypted according to Plaintiff's secret keys and symbols. See Exhibit 12 for a partial list of Plaintiff's codifications, which he recorded during a period of wellness in November 2008 (while he could still remember them).

177.    Plaintiff's art is influenced heavily by his favorite artist, Salvador Dalí.



*Chris and Salvador at the Dalí Museum in St. Petersburg, Florida on September 3, 2015*
*(Fountain of Milk Spreading Itself Uselessly on Three Shoes, aka Defendants' Motion to Dismiss)*

178.    Art is in the eye of the beholder.



*Visual excerpts of some of Chris' favorite works by Salvador Dalí as photographed*
*by Chris at the Dalí Museum in St. Petersburg, Florida on September 3, 2015*

179.    One man's trash is another man's treasure.



*More visual excerpts from the Dalí Museum as photographed by Chris*

180.   Intelligence is in the eye of the beholder.



*A comparison of Salvador Dalí's psychotic art...*

*...with Christopher Orloski's psychotic art produced while homeless in Washington, DC in 2006*

181.   It is likely that some of Plaintiff's art, garbage or otherwise, has been collected by law enforcement and the IC. The question before the Court is whether Plaintiff's freedom of speech is protected while he is in a state of delusional psychosis during which he believes that he can predict the future, thwart attacks such as Nine Eleven and, as a precrime officer, solve crime before it happens by distributing his art and reports. Plaintiff argues that even mentally disabled individuals, while sick, have a right to freedom of speech, even if their speech or art is viewed as incoherent or psychotic by others.

182.   It is possible that Defendants are retaliating against a mentally disabled individual because they despise the idea of being audited or investigated. The truth will be sorted out in the discovery phase of this action. It is possible that Defendants have taken Plaintiff's free speech and erroneously and/or intentionally construed it as a credible "true threat" as opposed to political hyperbole or delusional predictive analysis. Plaintiff argues that he has never been a credible threat or true threat. Any reasonable individual looking at Plaintiff's disability case holistically, would conclude that Plaintiff is not a credible threat to anyone and certainly not a credible threat to national security. See *Watts v. United States*, 394 U.S. 705 (1969), *Elonis v. United States*, 575 U.S. ___ (2015) and *Virginia v. Black*, 538 U.S. 343 (2003).

183.   It is interesting to note that in Plaintiff's times of crisis and illness, instead of receiving aid and support from a ***federal social worker*** at the yet-to-exist U.S. Department of Social Services to solve his housing issues, his homelessness issues, his healthcare issues, his loss of income issues, his starvation issues and his transportation issues, Plaintiff was bullied by Defendants, declared a terrorist by Defendants and left on the streets until he had contact with law enforcement. If a nation is judged on how its most vulnerable citizens are treated by its government, the United States of America receives a failing grade.



184.   These results are predictable when a nation transforms itself into a militarized police state.

52



*A sample report, which could be considered a work of art, that Plaintiff produced in 2006 while he was homeless and in psychosis. The work of art is entitled **"Dickhead Cop"**.*

# 11 Predictions on Survivability of Plaintiff's Claims

185.    Plaintiff predicts that several of his claims have sufficient merit to survive a motion to dismiss, to prevail at trial and to persuade Defendants to settle.

186.    Plaintiff's research indicates that his negligence claim, his gross negligence claim, his intentional misconduct claim, his IIED claim and his First Amendment claim will prevail. See Exhibit 09 at page 6 (exceptions listed in 28 U.S.C. § 2680), at page 12 (law enforcement proviso, which would apply to Defendants) and at pages 16-24 (IIED) (Source: *Intentional Torts and Other Exceptions to the Federal Tort Claims Act*, University of St. Thomas Law Journal, 2011, Exhibit 09).

187.    Plaintiff's other claims, with the complex exceptions, provisos, and exceptions to the exceptions of the FTCA applied, will likely fail unless the Court decides to set a precedent.

188.    As Plaintiff is limited by his mental disability and psychopharmaceuticals in understanding the provisions of the FTCA which intersect, overlap, or even collide in complex ways, he relies upon the expertise of the Court to determine which of his claims are valid in the context of the allegations, facts and evidence of the case.

189.    Further, Plaintiff relies on the Court for assistance during discovery to compel any recalcitrant Defendants to produce documents and information, which will point to either negligence or intentional misconduct or both.

## 12 Prayer for Relief

190.   Wherefore, Plaintiff prays for a judgment against the Defendants that:

1) Declares that Defendants have engaged in tortious acts and committed:

    a.  Negligence;

    b.  Intentional Infliction of Emotional Distress;

    c.  Battery through Proxy;

    d.  Intentional Misconduct;

    e.  Gross Negligence;

2) Declares that Defendants have violated Plaintiff's First Amendment right of free speech and Plaintiff's First Amendment right to create works of art while mentally well or unwell;

3) Declares that Defendants are in violation of the Air Carrier Access Act of 1986 (ACAA) through proxy of TSA and domestic and international airlines;

4) Declares that Defendants, through their deceit and misclassification of Plaintiff in their computer information systems, have violated 18 U.S.C. § 1001(a)(1,2,3) and 18 U.S.C. § 1038(a,b) (with a referral to the U.S. Attorney General to prosecute the individuals responsible);

5) Awards monetary damages:

    a.  Compensatory damages of thirty million dollars ($30,000,000); with contributions of:

        i.  Ten million dollars ($10,000,000) from FBI/TSC;

        ii.  Ten million dollars ($10,000,000) from ODNI/NCTC;

        iii.  Ten million dollars ($10,000,000) from FDLE;

    b. Punitive damages[26] of fifteen million dollars ($15,000,000); with

       contributions of:

         i.  Five million dollars ($5,000,000) from FBI/TSC;

         ii. Five million dollars ($5,000,000) from ODNI/NCTC;

         iii. Five million dollars ($5,000,000) from FDLE;

   c. Any additional punitive and compensatory damages that the Court

      deems fit and just and lawful;

   d. Plaintiff's court costs and Plaintiff's attorney's fees if any such costs or

      fees are accrued;

6) Requires Defendants to purge and remove from their databases (including

   TSDB and TIDE) all derogatory information and statuses about Plaintiff;

7) Requires Defendants to conduct a review of their intelligence collection,

   processing, and data-sharing and vetting of potential KSTs in light of the

   thousands or millions of erroneous statuses (individuals erroneously classified

   as terrorists) in their terrorist watchlist databases;

8) Imposes injunctive relief requiring Defendants and their employees to abide

   by tort law, the ACAA and other statutes and provide lawful intelligence

   collection, responsible use of intelligence stored in their computer information

   systems, and treat with respect individuals with mental disabilities without

---

[26] 768.73(c), Florida Statutes: Where the fact finder determines that at the time of injury the defendant had a specific intent to harm the claimant and determines that the defendant's conduct did in fact harm the claimant, there shall be no cap on punitive damages. *Chrysler Corp. v. Wolmer*, 499 So.2d 823, 825 (Fla. 1986): Punitive damages are imposed in order to punish the defendant for extreme wrongdoing and to deter others from engaging in similar conduct.

intimidating them through proxy or discriminating based on disability through proxy.

## 13 Trial by Jury Is Not Requested

191.    Trial by jury is not requested.

Respectfully submitted,

Christopher Orloski, *pro se*
1450 S MLK Jr Ave Apt 704
Clearwater, Florida 33756
corloski15@gmail.com
(727) 432-4391

An Agent
of Social
Change

## **Certificate of Service**

I hereby certify that the foregoing complaint was served by certified USPS and/or electronic mail and the Court's electronic case filing system ("CM/ECF") on this day, March 26, 2018 on the following Defendants and their counsel:

For the TSC and FBI:

U.S. Attorney's Office
Middle District of Florida
400 North Tampa Street
Suite 3200
Tampa, FL 33602
813-274-6000

Mr. Jim Agar
U.S. Department of Justice
Federal Bureau of Investigation
Office of the General Counsel
Civil Litigation Department
935 Pennsylvania Ave NW, Room 7427
Washington, DC 20535-0001
202-324-4064

For the NCTC and ODNI:

Office of the Director of National Intelligence
Office of the General Counsel
Washington, DC 20511

For the NCTC: nctcpao@nctc.gov

For the FDLE:

Florida Department of Law Enforcement
P.O. Box 1489
Tallahassee, FL 32302-1489

Christopher Orloski, *pro se*
1450 S MLK Jr Ave Apt 704
Clearwater, Florida 33756
corloski15@gmail.com
(727) 432-4391



An Agent
of Social
Change